The first matter we'll hear is that of Ebner v. Bank of Nova Scotia. Mr. Cogliani. Good morning. May it please the court. Vince Cogliani Jr. on behalf of appellate Donald Ebner. The core issue on this appeal is whether Mr. Ebner's claims are timely under record. And the short answer is yes. The district court found that Mr. Ebner's claims were untimely because he did not receive renewal notices because Scotiabank did not receive renewal notices for his insurance in 2015, 16, and 17. Let me ask you this. If he did receive notice, do you lose? I'm sorry, Judge McKeon, I didn't hear you. If your client did receive notice, do you lose? He did receive notice after the fact, Your Honor, that he was being placed or first place insurance was being purchased on his behalf. He did not receive notice before the fact, before July 2014, that Scotiabank was not going to pay his insurance premiums. And the notice requirement is a provision contained within the mortgage agreement, correct? Correct. All right. What we're really talking about here is a legal provision that is a statute of limitations of three years, right? Correct. And agreed upon obligations and duties under a mortgage agreement. Would you agree? Correct. I mean, we're not really acting here or considering anything beyond what the statute requires and what is required of the parties under the mortgage. Correct. So, you have, I believe, conceded, at least in your reply brief, that any activity in 2014 is time barred. Correct. Under Blake, under the recent Blake decision, it's time barred. Okay. So, with that as a starting point, what are you basing your statute of limitations argument on, on the separate accrual rule? Yes, on the separate accrual rule, Your Honor, I know. I asked that. Set forth in Blake or applied in Blake. The reason I asked that is that your opening brief seemed to me primarily to argue the continuing violations doctrine, but the reply brief then concentrated more on the separate accrual rule. Because Blake was decided in between the filing of the opening brief and the reply brief. And Blake obviously made clear that the continuing violation doctrine was not applicable here. However, that the separate accrual doctrine could save Mr. Evers' claims beginning in 2015. Right. And also, just to clear things up or to get certain matters off the table, may I assume that the discovery rule is also not in play here? Also under Third Circuit precedent, the discovery rule is not applicable to rest of the claims. Under Cunningham. Correct. Okay. 2015, again, under, Your Honor, under Blake, there is no continuing violation on these facts. However, there is, as in Blake, there is a series of separate violations, each of which trigger or have their own limitations period. Let's talk about that and hearkening off what Chief Judge Smith was saying. The agreement sets forth the parties' obligations to each other. And in Section 3, the obligation is imposed on the borrower to, quote, promptly furnish to lender all notices of amounts to be paid, close quote, for escrow items. Because it's in Section, it refers back to Section 3. So isn't it under the terms of this agreement the burden of proof on the plaintiff to demonstrate that the bank was on notice to pay the amount due? And as I read the record, I see assertions that the bank received no notice, but I see no caring of a burden of proof by the plaintiff that notice was received. Or given either by himself, the borrower, or under a more generous reading, quote, his agent, his insurance company. So tell me how is it that the proof would satisfy the obligations of the agreement, assuming 2015 is timely and one could argue that 2015 couldn't be a violation because the policy was canceled and that wasn't due. So just put that moment aside and focus, if you could, on the burden of proof question. As to the notice issue, Your Honor, it is undisputed that Scotiabank renewed Mr. Evers' insurance without his involvement, without him sending notices in 2011, 2012. You're asking us, then, to apply a customs and practice sort of theory, and I didn't see any law that supports that. I'm asking you to – I'm saying that the jury could reasonably infer that Scotiabank received a renewal notice in 2014 if it received them in 2013, 2012, and 2011. But you haven't carried – I didn't see in the record proof from even Legacy Bank that it sent notice to – I'm sorry, Real Legacy, I'm sorry, Real Legacy, the insurance carrier, sending things to the bank. Your Honor, there's one renewal notice that was sent to the bank in the record that was for 2011, 12. They did receive that. There's no – they did not produce any documents. So is that all that is in the record by way of receipt of renewal notices? Yes. So that I understand, then, are you asking us to extrapolate from that, that past experience, this continuing obligation? I mean, is that the sole evidentiary basis pursuant to Judge Schwartz's questions? No, Your Honor, but it's one. And I believe a reasonable jury could infer, could find, based on Scotiabank's payment of insurance premiums in 2011, 12, and 13, that they also received a renewal notice in 2014, even though Scotiabank did not provide a copy of that. But the bank's – the record in front of us, undisputed record, is the bank represented in letters sent to your client. I know your position is that they weren't received. But notices saying we have no notice. So the record, the only inference that could be drawn, is that they never received notice from anybody. And so isn't that the biggest challenge you face here, putting aside the timeliness issues? Your Honor, I don't – I don't think it is because there is no – based on Scotiabank's repeated renewal of the policy in July of every year, in 2011, 12, and 13, without Mr. Ebner's involvement, without him providing a renewal notice, they renewed it. And based on that evidence, I believe a jury could find, reasonably find, that they also got a notice in 2014 and just didn't pay the – just for whatever reason, didn't pay the premium. Secondly, and separately, as an independent basis for our claim, is the argument which we set forth in our briefs, that nothing in RESPA requires receipt of a renewal notice. It simply requires the payments to be made in a timely manner. But – go ahead. Nope, it's all yours. Bye. But the mortgage agreement clearly places the right and the obligation on the mortgagor to choose the carrier, right? Which he did. And to place that insurance, and then the escrow, of course, pays. But that places the onus on Mr. Ebner, right? In the first instance, I believe, Your Honor, and if we look at the way the contract was performed, yes, in the first instance – If he's the one who entered the contract, if the contractual relationship is between him and the carrier, and he gets a better deal from another carrier and decides to place insurance with that carrier, then again, it's going to be up to him, is it not, to alert the mortgagee to who that carrier is or ask that the carrier send notice to the mortgagee? If he was switching carriers and got a better premium, sure, yes. So at least from the outset, whether we're talking real legacy or whether we're talking about a successor, a chosen successor carrier to real legacy, the obligation is going to be on the part of Mr. Ebner to select the carrier and to notify the bank in some fashion, if they're going to ever be able to pay out of the escrow the premiums. Again, Your Honor, I believe you're correct in terms of what was contemplated in the first instance  and provided his escrow agent, Scotiabank, with the name of the carrier and the information that was necessary to renew the policy. At that point, it was out of his hands. His only obligation was to escrow funds sufficient to pay the premiums. He did that, heard nothing at all about this. Scotiabank every year renewed the insurance without his involvement. Doesn't it seem odd that all of a sudden Scotiabank would pay premiums on forced place insurance rather than to real legacy or to someone else? If they had the information concerning to whom and how much premium to pay? Your Honor, certainly you'd have to believe that they were negligent or reckless in not doing it. I believe that happens. I believe that's not impossible that in 2014, for whatever reason, they neglected to pay his premium. They clearly knew when it was due based on the past three years of their payments, July of every year. They clearly knew it was due. For some reason, they don't pay it. They've never provided an explanation. Was it negligence? Was it recklessness? Was it intentional? We don't know. I don't think that's a question we need to answer. They did send two notices requesting renewal, though, didn't they? I thought it was agreed that they sent two notices properly addressed that the client just claims he never received, requesting a proof of insurance. That's correct, Your Honor. They claim that they sent notices by first-class mail. Mr. Abner claims he never received them. The question is, does the statutory notice provision override the traditional common law mailbox rules? Because if they sent it to the proper address, the law would presume that he did receive it. There's a presumption. I think it's a conclusive presumption, unless the statutory language negates that rule. Your Honor, I think the statutory language can be read as saying you comply with the notice requirements if you put something in first-class mail. The mortgage agreement actually says that, too. If there's a deposit in the mail of a notice, it's deemed to be received under the mortgage agreement, but you have the mail presumption, you have the statutory presumption that Judge McKee was speaking of. And the other thing we have in this record is he received a check for $15,000, and it was cashed. So we know he was getting mail at that address. That was connected to this very subject, that is, the return of escrow funds because the forced placement of insurance wasn't as expensive. He did receive mail at this address, correct. And it was not only mail, but mail that related to this very topic, in addition to, according to the record, what I'll call 1099s, but the tax documents about the interest he had been paying and other things he acknowledged receiving. Correct. Correct. So we have to – how do you overcome that presumption? Well, I think it is a presumption. I think it does shift the burden to Mr. Ebner to prove he didn't receive it. I think a jury could find he could meet that burden. How? For two reasons. One, he kept funding the escrow account. I'm sorry, Your Honor. I'm sorry. So if that's all that's required to overcome the presumption to say, well, I didn't get it, then that's the exception that overrides the rule. Then there's no presumption. There's got to be more required than just saying, I never received it. Because every time there's a dispute, there's going to be a dispute because the agency will say, why didn't you receive it? And they would have the burden of proving, Your Honor, that they didn't receive it. And if their evidence is sufficient for a reasonable jury to find that they didn't receive it and considering the burden of proof, I think that's the way it's supposed to work, Your Honor. In most cases, either a court would say there isn't sufficient evidence for the plaintiff to overcome simply by saying, I never received it. That can't be enough, right? It can't be enough to say, I never received it. It can't be enough. If that were the case, the presumption doesn't work. Exactly. It can't be enough. And in this case, we have two other facts. One is he continued to fund the escrow account in contemplation that he was paying the insurance premiums to Real Legacy. And two, after the hurricane, Hurricane Maria in 2017, he contacted Real Legacy and said, I want to make a claim. That is certainly consistent with someone who did not receive notice that his policy had been canceled and that he was now covered by forced place insurance. Mr. Culliane, I neglected to ask you at the outset, how much time did you reserve for rebuttal? I'm sorry, Your Honor. Five minutes? Is that still possible? Oh, yes. Yes, certainly it is. We'll have you back on rebuttal. Thank you, sir. We've already gone almost five minutes extra. Thank you. Ms. Rich. Thank you. Good morning. I think the Court has already hit on many of the subjects that I was going to address this morning. Every now and then, we get it. Very often and all the time, in my experience. Let me ask you about the various mortgage documents that Scotia Bank used or would have used here. Could Mr. Edner have given the bank two mailing addresses? I think he's a Missouri resident, if I recall. He also has this mailing address in the BI, which I also believe the record shows he did alert the bank to. Is that correct? Your Honor, actually, Mr. Edner was a resident of the Virgin Islands when the loan was initiated. He only moved to Missouri in 2014. And clearly, under the closing documents ---- that 2014 is not really an issue here, then at all relevant times going forward, he was in Missouri at some point, right? And he was always free to give the bank an alternative mailing address. What the certification of mailing that he signed at closing means is that this is the address, this inquiry address, to which we are going to send all notices regarding your mortgage loan. If you want that address to change, you have to tell us in writing. And Mr. Edner never did that. He never gave an alternate address. He continued to use his St. Croix address and, in fact, still uses it today, as far as we know. But he certainly continued to use it throughout all of these events. And so the answer to your question is no, a customer is not supposed to have two mailing addresses for purposes of clarity and knowing where to send the notices. There's supposed to be one. That's why there's a mailing address certification at closing. And then if the customer wishes, excuse me, to change that address, of course the customer is free to do so. So if Mr. Edner wanted to receive mail in Missouri after he moved in 2014, all he had to do was notify the bank. He did not. He continued to receive mail in St. Croix. And as Judge Schwartz pointed out, not only did he continue to use that at his mailing address, when Scotiabank sent him a check to that address, he received it and cashed it. So we know that he was continuing to collect that mail. There's absolutely nothing in the record, other than Mr. Edner's bare self-serving statement, to support the claim that he didn't receive the notices. The record suggests that he just didn't bother to read them. And that isn't the bank's problem. And to go back to the discussion about the bank's obligation under RESPA and under the mortgage, the bank's obligation is to pay an amount when due. The bank can't pay without an invoice. Banks don't just write checks to insurance companies based on what they charged the previous year. So we know from the record that in the past, in 2011 to 12, 12 to 13, 13 to 14, the bank made payments. Mr. Morton's affidavit says it received the bank received proof of renewal of the policy. Presumably that's what triggered the notice. From whom did they get the renewal? I didn't see anything in the record that identified. It was kind of a passively written sentence. So I don't know who provided notice. And I'm not sure that I know what was on the outside of the envelope. It's common practice that once the insurance carrier is made aware that a bank is an additional loss payee, that when the borrower confirms that they want the insurance renewed, the insurance carrier will send the notice directly to the bank. And so it is certainly possible that Mr. Ebner was not directly involved in sending the notices in 2012 or 2013 because they came from Real Legacy. And it is certainly possible that Real Legacy is the one that messed up in 2014 and failed to send the notice. But what we do know from the bank's affidavit after searching their records and from logic since they sent three letters in 2014 saying, hey, Mr. Ebner, we have not received your renewal notice, that the bank didn't get it. Whether that was Mr. Ebner's fault or Real Legacy's fault is really not at issue because clearly in bringing this claim and in trying to establish that there was some sort of violation of RESPA when the bank purchased the forced place coverage so that its collateral would be protected, there has to be some proof that the notice was sent by someone. And for reasons that we will never know, Mr. Ebner made no effort to provide that proof. All he had to do was request from Real Legacy proof that they sent the notice if he didn't. Or, you know, because they're his carrier. As the court pointed out, I think Judge Smith, a borrower can change insurance companies. Premium amounts can change. It can go up or down depending on whether the coverage changes. The only way the bank is going to know is if they get that information. Right. If they get a bill, an invoice from the insurance company. That's what they pay. They can't just write a check based on an invoice that doesn't exist. Let me get you to get us back to a legal question. Yes, sir. Do you agree with Mr. Coliani that what's applicable here is a separate accrual rule? No. Why not? Because the Bates case talked about an illegal kickback scheme. So every time the bank got a kickback for the way it was placing insurance in Bates, there was a separate RESPA violation. The separate accrual rule cannot apply without a separate violation. It's really not all that different than the continuing violation rule. It's just kind of a different way of articulating a very similar concept. And so in order for there to be a separate accrual, Scotiabank had to do something in 2015 that violated RESPA. Or not do something. Or not do something. But since it's undisputed that the real legacy policy lapsed after it wasn't paid in 2014, and the district court assumed that even if that had been Scotiabank's fault, although there's absolutely no evidence in the record to support that, everyone knows, and I think that the plaintiff even admitted, that once there was no relationship anymore between real legacy and Mr. Ebner, they weren't going to send another notice to Scotiabank, because they no longer had any relationship with this insured. I'm not my question was not whether Ebner prevails under the separate accrual rule. My question was whether you agreed that it's applicable here for purposes of our analysis. Oh, okay. Yes, I suppose it's applicable, but it's still. I asked the question, and it may have to do with the sequence in which applicable law here changed. But I don't recall that in your brief you addressed the separate accrual rule, and it came up in the reply brief. That's correct. So I'm trying to figure out areas where there may be some congruence in the positions of the parties, at least in terms of how we analyze this case. That is correct, Your Honor. And I don't think it changes the analysis at all. I agree that it is the only legal basis left to the plaintiff to try and find an argument that would salvage this case. And when you say it, what are you talking about? I'm talking about the separate accrual argument, which, and again, in order for that to apply, you still have to have some affirmative evidence from the plaintiff that something happened in 2015 that was a violation of either the mortgage or RESPA. And there's absolutely no evidence of that. So what happened in 2014 that caused the bank to do something? I'm sorry? What caused the bank to act in 2014 to send those letters? The failure to receive any renewal premium notice from Real Legacy or Mr. Ebner or anybody else. I mean, again, the banks, and I disagree with the district courts even entertaining an assumption that the bank may have committed a RESPA violation in 2014 because there's absolutely no evidence to support that. The assumption that because the bank paid a renewal premium in 2013 and Mr. Ebner claims that he had nothing to do with that doesn't prove anything. All that proves is that somebody, whether it was Mr. Ebner or Real Legacy, sent an invoice to Scotiabank and they paid it. The letters that Scotiabank sent in 2014 clearly establish that they believed that there was no renewal notice. They had not received a notice. They had nothing to pay. And they were asking their borrower, which is the person with whom they have the And they're telling him, we don't have your renewal notice. And they're giving him all kinds of options to fix that problem. Well, let's get back to what I understand to be the theory of the plaintiff's case here, and that is their reliance upon past experience. I don't have it before me, but I think 2605A, the text of 2605G, rather, doesn't include any language about written notice. And if that is the case, and I'd like to know why past experience is necessarily insufficient to trigger as payments become due. If I understand, okay, I'm looking at the text, I think, of 2605G, which was in my brief at page 9, running on to page 10. And it says, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due. And so one has to interpret when does a payment become due. And I do not believe that this means that when the insurance expires and the renewal is due, that the payment is due. Payment cannot be due until there's an invoice, because the bank needs to know how much to pay. And so the question ‑‑ and so clearly the bank has an obligation to do something when the time comes or, I'm sorry, not an obligation, an option to do something. If they don't get an invoice, there's no payment that's due, so they can't pay it. They don't even know how much, because you can't assume that the amount's going to be the same or even to the same carrier. They don't have an option to actually do anything at that point. Banks are not required to purchase fourth place insurance. They do it because they want to protect their collateral, but they're not required. RESPA would not be violated if Scotiabank did nothing. Is part of the reason why you say that payments can only be made when an invoice is received is because you're talking about the expenditure of escrow funds, which really don't belong to the bank. You're just holding it in trust. And so that's the only way you know how you know to direct funds that aren't the bank's? Well, I would say that's a heightened requirement with escrow accounts. Because that's what we're talking about here. Yes, exactly. But with any payment, I mean, I've been representing banks for years, and even when I need a payment from them, which is not from escrow to pay a property tax or do something, I need to send them an invoice. Banks, in my experience, do not write checks to anybody for anything without an invoice. If you say we should focus on your experience or experiences as a general matter, your adversary would like us to do the same thing, and this custom's in practice. And I think what Judge Smith was asking about is if there's anything in the statute itself that says we cannot rely on past practice and experience, your position, I gather, is saying not when it comes to payments that are due. Because you have to have an invoice. I would say, first of all, I take your point, Your Honor, and I was simply trying to answer your question and agree with you, that particularly when it comes from dispersing funds from escrow, banks need invoices to do that. Same thing with property taxes. They have to pay them when they get the tax bill. This past experience theory I take to be essentially, even though Mr. Coliani has not characterized it as such, as circumstantial evidence. That is, past practice is something from which can be inferred what happened later. And so I take it from your response to Judge Schwartz's question is that in any event, that's just not enough. That's just, even if we could say that somehow this becomes circumstantial evidence, it's not enough to carry the day. I would give, I would answer you in a couple of ways to that. Number one, yes, I agree with your initial statement. But number two, I would argue that the circumstantial evidence does not support that conclusion because of the notices the bank sent and the bank's affidavit and the fact that they went to the proper mailing address. All of that evidence, which is in the record and is unrebutted, shows evidence that the bank did not, in fact, receive a notice as they had in the past. Because in the past, they didn't send such letters. Why would the bank, with sufficient funds in escrow, fail to pay a premium unless they didn't get it? And so the circumstantial evidence simply does not support Mr. Ebner's position. And then I would also say that the statute doesn't because it is absolutely correct, as Judge Schwartz pointed out. We're talking about escrow funds. And payments are made when they're due, and a payment is not due until there's an invoice and a due date. And so just because the renewal of the policy was due, that didn't make a particular payment due because we didn't have an invoice or an amount. And again, you cannot infer that there must have been one because there was in the past when Scotiabank sent letters saying we didn't get it, which they had never done in the past. So why would they do that? The only other inference that makes any sense is that for whatever reason, Real Legacy failed to send the invoice. And I would point to the fact that Mr. Ebner made no effort to prove otherwise tends to show that that's because he couldn't. In other words, you must infer from his failure to even attempt to present an affidavit or a copy of a notice or anything from Real Legacy to meet his burden is that it doesn't exist. Judge McKee, Scotiabank's time expired just a bit ago, but do you have any questions at this juncture? No, thanks. I'm okay. I don't have any questions. Judge Schwartz? All right. Thank you very much. Thank you. Ms. Rich. Mr. Cogliani, we'll have you back on rebuttal. Oh. Judge, picking up on your line of questioning with respect to past practice and circumstantial evidence of receipt, the issue is whether a reasonable jury could find that Scotiabank knew that the payment was due and didn't make a timely payment. First, they made payments in 2011 and 12 and 13 as the record shows. They only produced one notice from 2011. They didn't produce any notices from 2012 and 2013. I believe a jury could infer that because they paid the premiums and knew the amounts that they did, in fact, receive notices and paid them. You could also, in the alternative, infer reasonably that they didn't get notices in 2012 or 13 or they would have produced them, and yet they still renewed the policy, still knew the amount, and were able to keep the insurance current. So how would they know the amount? I'm sorry, Your Honor? How would they know the amount? Based on the prior year. The fact is, Your Honor, they renewed it. They don't have evidence they received a renewal notice or a bill, yet they renewed it. But why would they assume that last year's amount was the same as this year's amount? That assumes that they would think, well, there could have been an increase. The insurance wasn't paid someplace else. Why would anybody assume that? I understand that, Your Honor. That doesn't seem like a reasonable assumption.  What doesn't seem like a reasonable assumption? That the prior year's premium would be the same as this. You obviously don't have the same insurance carriers that I have. What I'm saying is it's not reasonable to assume that your last year's premium will be the same this year. That's correct. I'm answering Judge McKee's question. However, the fact is, the record shows they renewed it, and there is no evidence of invoices or renewal notices for the years 2012 and 2013. You can infer they got them because they did renew it. Or you can, in the alternative, infer that they didn't need them to renew. And that, in fact, maybe the premiums were the same or maybe they were able to determine that amount with correspondence or without receiving a formal notice. But the fact is they renewed it in 2012 and 2013. They did not produce notices for that time period. And what changed in 2014? The only thing that changed is they didn't make the payment. And Scotiabank can argue we had no reason not to make the payment, et cetera. However, the question is, could a reasonable jury find that they received notice and didn't make the payment for whatever reason? Anything further? That's all I have. Thank you. Judge McKee, any further questions? I don't think so. Thank you very much. Thank you, Mr. Cogliani. Thank you, Ms. Rich. We appreciate your helpful arguments. We'll take the matter under advisement.